Filed 4/23/25  In re Nav. B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re Nav. B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>A.B. et al.,<br><br>    Defendants and Appellants. | E084405<br><br>(Super.Ct.Nos. J299576-79)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant, A.B.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant, L.B.

1

Tom Bunton, County Counsel and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

L.B. (Mother) and A.B. (Father) challenge the order removing four of their minor children from their care under subdivision (c)(1) of section 361 of the Welfare and Institutions Code (§ 361(c)(1)).  (Unlabeled statutory references are to this code.)  With respect to all four children, they contend that the juvenile court applied the wrong legal standard in removing the children, because the court stated that the jurisdictional findings were prima facie evidence to support removal even though the petitions contained no allegations under subdivision (e) of section 300 (§ 300(e)).  The parents also challenge the sufficiency of the evidence supporting removal of two of the children.  We affirm.

BACKGROUND

I. *Family background*

Mother and Father are married and have seven children:  (1) Nav. B. (female, born in May 2023); (2) Nia. B. (female, born in January 2021); (3) Nolan B. (male, born in 2017); (4) Nori B. (female, born in 2015); (5) Nala B. (female, born in 2008); (6) Niy. B. (female, born in 2006); and (7) Anthony B. (male, born in 2003 or 2004).  This appeal involves only the four youngest children.

The parents have a history of domestic violence.  Father was convicted of battery in 2003 and spousal battery in 2008, and law enforcement responded to a report of domestic violence in the home in 2014.  In 2014, Mother reported that Father punched her twice in the face and that she punched him in response.  Father told San Bernardino

2

County Children and Family Services (CFS) that the last incident of domestic violence occurred in 2003, after which he attended domestic violence classes.

II.     *Dependency history*

The family has a recent dependency history. In March 2022, CFS responded to a referral alleging that then-16-year-old Niy. and 13-year-old Nala reported that their 18-year-old brother Anthony had sexually assaulted them. Nala told Mother that she performed oral sex on Anthony one week ago at his request, and the same thing happened when she was seven or eight years old. A law enforcement officer interviewed Nala and Niy. Nala disclosed that Anthony had "forced her to have oral sex aggressively, by pushing her head down and placing his hands down her shirt" and that it had happened more than once. Nala showed the law enforcement officer text messages of Anthony asking Nala to go to his room. Niy. reported that a sexual encounter with Anthony occurred and the abuse "'lasted a couple of years,'" but she also said that Anthony had "not asked her to perform sexual acts, since 2012," when she was five or six years old. She denied having sexual intercourse with Anthony.

Mother told the law enforcement officer that the family preferred to handle the matter privately and that Anthony denied the allegations. Mother reported that she was aware of a previous sexual encounter between Anthony and Niy. in which a friend showed Niy. pornography and Niy. "reenacted the same behaviors, by pleasing [Anthony] orally when she returned home." Mother believed that all of the children involved in the incident were victims of sexual abuse.

3

A social worker met with both parents in March 2022, and they agreed to a safety plan that required Anthony to live elsewhere temporarily. In 2024, CFS reported: "Unbeknown to the department, it was later revealed that [Mother] picked up adult sibling [Anthony] and placed him back in the home the same night, which breached the safety plan agreement." In April 2022, the parents told social workers that they were no longer interested in CFS's intervention and directed the social workers to leave their home. Nala and Niy. did not attend scheduled forensic interviews. CFS took the children into protective custody pursuant to a warrant.

The paternal grandmother spoke with a social worker in July 2022 and claimed that Anthony lived with her in Las Vegas, Nevada. The parents reported that Anthony was not allowed in the home. The following month, the juvenile court declared all five minor children (Nav. was not yet born) dependents, sustaining allegations under subdivisions (b), (d), and (j) of section 300 as to Nia., Nolan, and Nori and subdivisions (b) and (d) of section 300 as to Niy. and Nala. The court issued a no-contact order between Anthony and his siblings.

In December 2022, CFS recommended that the dependency case be dismissed on the basis that "the parents appeared to be rehabilitated and abiding by the no contact court order," and the juvenile court dismissed the case. The children were returned to the parents with the understanding that Anthony would not be living with the family.

4

III.    *Present investigation*

In September 2023, CFS received two referrals concerning the family. One alleged general neglect and physical abuse of all six of the minor children perpetrated by the parents and Anthony, and one alleged that Anthony sexually abused Niy. Seventeen-year-old Niy. had been placed on a section 5585 psychiatric hold by law enforcement after an altercation at home between Niy. and Mother.[1] During the hospital intake process, Niy. reported that Father choked her two months earlier and that he spanked two-year-old Nia. Niy. also disclosed "that her adult brother Anthony . . . has moved back into the home and had oral sex with two (2) of her siblings (unknown names)" and that she had "sexual intercourse" with Anthony between the ages of five and 13 years old. Niy. said that Mother blamed her for the sexual abuse and that Mother claimed that Niy. had initiated the incidents.

A social worker spoke on the phone with Mother about the referrals in December 2023. Mother denied that either she or Father physically abused the children, and she attributed the reports of abuse to Niy.'s mental health crisis. Mother said that CFS was not welcome at her home.

The paternal grandmother spoke to the social worker and expressed concern about the children. She reported that the home was unsafe because of violence, emotional abuse, and possible ongoing physical abuse of the older children. The paternal

---

[1]    The record mistakenly refers to Niy.'s hospitalization as a section 5150 hold, but Niy. was a minor, so the hold was under section 5585.

grandmother reported that Anthony had never lived with her and that she previously lied to the department because the parents asked her to.

A social worker contacted staff at the school attended by Nolan and Nori. The staff person provided the social worker with a student profile form that the parents filled out in August 2023 for the upcoming school year. The form stated that Anthony lived with the family.

In December 2023, CFS discovered that the state welfare database listed Anthony as living in the parents' residence. In early October, Mother updated an application for state welfare benefits, signed by both parents, that stated that the home was occupied by three adults and six children. Anthony was listed as working at Del Taco. According to notes entered in the state welfare database, Mother called the welfare department the following week to report that the family's income had changed as Anthony no longer worked at Del Taco, where he was employed for about two weeks. In an application for state welfare benefits signed by both parents the day after the August 2022 jurisdiction and disposition hearing in the prior dependency case, the parents identified Anthony as an adult living in the home. In late August 2022, Mother reported to a welfare eligibility worker "that her 18-year-old son was visiting his grandparents for two (2) weeks but when [Mother] spoke to the worker, it was taken as if he was out of the home." (Italics omitted.) Mother told the eligibility worker that Anthony then lived in the home.

6

CFS obtained a warrant in January 2024 to take all six minor children into protective custody. Social workers took custody of nine-year-old Nori and six-year-old Nolan at their school and immediately took them to forensic interviews. In those interviews, both Nolan and Nori confirmed that Anthony was living with the family in a bedroom directly across the hall from the bedroom shared by Niy. and Nala, which Nori noted had a lock on the door. In describing the September 2023 altercation that led to Niy.'s hospitalization, Nolan said that Anthony was present in the home and protecting Mother. Both Nori and Nolan denied that their parents and Anthony were physically or sexually abusing them.

Social workers attempted to take custody of Nala and Niy. at their high school, but the school reported that both girls were in a home hospital program. The social workers went to the family's residence to serve the detention warrant and take custody of the remaining children, but no one answered the door. Mother called one of the social workers later that day. The social worker informed Mother of the detention warrant and asked Mother to surrender the children to CFS. The social worker advised Mother that the children were being detained because CFS had reliable information that Anthony was living in the house. Mother denied the allegation.

IV.  *The allegations and the initial hearing*

In January 2024, CFS filed dependency petitions as to all six minor children. The record on appeal contains only the petitions pertaining to the four youngest children (Nav., Nia., Nolan, and Nori). Those petitions contain jurisdictional allegations against

7

both parents under subdivisions (b)(1), (d), and (j) of section 300.  With respect to Nia., the petition also contained an allegation against both parents under subdivision (a) of section 300.

The court held a detention hearing in early January 2024, which both parents attended.  CFS noted in the detention report that the parents had not yet surrendered Nav., Nia., Nala, and Niy. to CFS's custody.  At the hearing, the juvenile court detained all six children from both parents.  The court ordered supervised visits for both parents and ordered CFS to provide the parents with predisposition services to facilitate reunification.

V.      *Jurisdiction and disposition*

The jurisdiction and disposition hearing was initially set for late January 2024, but the contested jurisdiction and disposition hearings were held over the course of several days in June and July 2024.  Niy. turned 18 years old in February 2024.  Between January and June 2024, CFS filed numerous reports, including a jurisdiction and disposition report in late January 2024 and eight additional information or addendum reports between January and July.  All of the reports were admitted at the jurisdiction and disposition hearings.

A.      *Events between the initial hearing and the jurisdiction hearing*

On the day of the detention hearing, the court issued a warrant for CFS to detain 15-year-old Nala, who remained at home.  The parents let the social workers and a law enforcement officer into the home, where Nala was locked in her bedroom.  Nala refused to leave or to talk to the social workers.  Seventeen-year-old Niy. was taken into custody

8

after the detention hearing and stayed with Nav. and Nia. at CFS's office for two days. When Niy. learned that placement had been secured for Nav. and Nia. without her, Niy. went AWOL. CFS filed a missing person report and contacted the parents, who suspected that Niy. was with her boyfriend.

In the jurisdiction and disposition report, CFS reported that Nala and Niy. remained at home and refused to be taken into CFS's custody. Nori and Nolan were placed together with a foster family, and Nav. and Nia. were placed together with a different foster family.

Around mid-January 2024, a social worker separately interviewed both parents at their home and also interviewed Nala while there. Both parents denied that Anthony lived in the home or had lived there since the prior case. Nala said that she had not seen Anthony for two years. The parents and Nala could not explain why Nolan and Nori would say that Anthony lived at home when he did not. Nala did tell the social worker that Niy. sometimes went into Nolan's and Nori's bedroom "and tells them to say things." Mother reported that when the prior case closed the social worker told them that Anthony was allowed to be at the home for the holidays and special occasions. Mother refused to say whether that had happened.

The social worker asked both parents to provide a timeline of where Anthony had lived since the prior case closed in December 2022. Both parents said that Anthony lived with the paternal grandmother in Las Vegas when the case closed. According to Father, Anthony then moved back to southern California and lived with a friend in a mobile

9

home not far from the family until that friend moved to Arizona in September 2023. Mother too said that Anthony moved back to southern California, but she said that he lived in a trailer that the parents purchased for him but later sold because Anthony did not get a job. Father said that Anthony worked at Del Taco for two weeks but had to go live with a maternal great-uncle in another city. Both parents reported that Anthony at some point lived with a friend who lived near a Circle K. Mother also said that she arranged for Anthony to live with her uncle, whom CFS was unable to interview for the jurisdiction and disposition report. Both parents said that Anthony was now living in the One-Stop TAY Center in Yucca Valley, where Mother said that he had been for perhaps a couple of weeks. Mother refused to give the social worker Anthony's phone number.

Mother later sent the social worker internet bills addressed to either Anthony or Father for July 2022 to April 2023. The bills were for service provided at the address in California where Mother claimed Anthony was living in a mobile home park. CFS noted that this new evidence contradicted Mother's report in the prior case that Anthony lived in Las Vegas.

With respect to Anthony's inclusion on the applications for welfare benefits, Mother explained that she included him because she was concerned that he would lose medical benefits if she removed him from her case. She had recently learned that his case could be transferred, so she discontinued him from her case on January 16, 2024. As for Anthony's inclusion as a household member in the August 2023 student profile at Nori's and Nala's school, Mother claimed that she did not add him but just clicked

10

through the form quickly without updating it. She claimed that she had since removed his name.

In addition to inquiring about Anthony's whereabouts, the social worker asked both parents if they believed Niy.'s and Nala's disclosures that they were sexually abused by Anthony. Father responded, "'It's tricky because I believe all my kids.'" He added that Anthony claimed that "'he didn't do anything.'" Father complained that Anthony had not received "due process" in the previous case. Mother responded that she "'of course'" believed Nala's and Niy.'s disclosures. Mother also stated that she did not believe that CFS investigated the allegations well, because no one spoke with Anthony. She added that she believed that Niy., Nala, and Anthony "were being secretive because she didn't see any signs that the girls were being sexually abused."

Nala denied that there had been any additional sexual abuse since the prior dependency case. She reported that she "'would probably feel a bit unsafe'" if her adult siblings were around but also indicated that her parents were protective. Nala refused to be taken into custody.

After interviewing both parents and Nala, two social workers walked through the four-bedroom home, which had two hallways with two bedrooms accessible from each hallway. Nala and Niy.'s shared bedroom was not on the same hallway as the parents' bedroom. Mother reported that the other bedroom on Nala and Niy.'s hallway previously belonged to Anthony but is now a game room. The room contained a pack-and-play and

a section of a couch placed in front of a television.  There were clothes in the closet that Father said belonged to Nala, who he said was attempting to claim the room as hers.

A social worker briefly spoke with Nolan and Nori in January 2024 after visiting the parents' home.  The social worker asked both children who was living in their home before they came to CFS's office and were placed with their caregiver, and both responded that all six other children, including Anthony, lived in the home, along with both parents.  Nori said that she celebrated the past Christmas with the entire family, including Anthony.  Asked to describe Anthony's bedroom, Nori said that it had "LED lights, a bed, and a X-box."  Nolan agreed and added that the room also contained a dresser and Anthony's clothes.  Nolan denied that the home had any empty rooms or a playroom.

Mother called CFS the day after she was interviewed and reported that Niy. had returned home.  The following week, a social worker urged Mother to encourage Nala and Niy. to be taken into custody because it was ordered by the court.  Mother said that the girls had "minds of their own" and were unwilling.  Mother sent the social worker text messages with video recordings of both girls in which each explained why they did not want to be taken into custody.

In an addendum report filed in late February 2024, CFS reported that Nala remained at home and refused to be taken into custody.  In early February, the caregiver for Nolan and Nori gave a 30-day notice to change the children's placement.  The caregiver was "no longer willing to care for the children due to concerns with the

parents." During visits with the children in February, Mother reported that Nia. had a scrape on her chin, Nolan and Nori wore the same shoes every day, and Nav. wore the same clothes to visits. Mother learned that Nia. received a flu shot and informed CFS that the parents did not approve of the children receiving flu shots.

In a report filed in late March 2024, CFS reported that Nori and Nala had been placed with a different caregiver earlier that month. In early March, the caregiver of Nav. and Nia. reported that law enforcement came to her home because Mother called them and expressed concerns. The caregiver gave a 14-day notice to remove Nav. and Nia. from her home. Mother told a social worker that the caregiver had provided Mother her address, but Mother had no explanation for why the caregiver would do that. After speaking with the social worker, Mother again called law enforcement to check on Nav. and Nia., and they again went to the caregiver's home. The following day, Nia. was moved into a special needs home, and Nav., Nori, and Nala were moved together into a different caregiver's home.

During a supervised visit in March 2024, Nolan asked the parents, "'[D]id Anthony leave,'" and Mother responded, "'[W]e are not going to talk about that.'" A social worker informed Mother that there were safety concerns with the visits because Mother had a caregiver's address.

A mediation was held in mid-March 2024. Father said "that the social worker lied in the prior case." He called the lead social worker in the ongoing case "a liar." The parents refused to continue mediating after 15 minutes.

13

A social worker visited the parents' home unannounced in March 2024 to check on Nala. Father answered the door and got Nala, who came to the door. The social worker asked Nala to put on shoes so that she could join the social worker outside. Nala got her shoes and returned to the door, but Father told Nala that she did not have to go outside. Fifteen-year-old Nala again refused to be taken into custody.

In February and March 2024, CFS reported that both parents refused to sign consent forms to be referred to services. Mother previously indicated that she was willing to go through her medical carrier to attend therapy, but CFS advised her that she would still need to sign a consent form for CFS to communicate with the therapist.

CFS learned in March 2024 that Mother set up a GoFundMe page in January for assistance with legal fees. The fundraiser contained a photograph of the four youngest children. In the fundraiser, Mother said that CFS removed her children because they were mad that they were returned in the prior case and that CFS removed the children without following regulations. At a hearing in late March 2024, the court ordered Mother to remove the GoFundMe page within 48 hours because of the confidentiality of the proceedings and Mother's inclusion of the photograph. The court warned Mother that she could be found in contempt if she did not comply. At CFS's request, the court ordered visitation to be supervised by CFS at a specific CFS office.

In an additional information report filed in early April 2024, CFS informed the court of Mother's recent social media activity. CFS attached to the report several printouts of posts that Mother made on various social media platforms about the

14

dependency proceeding. Mother posted photographs of the children along with confidential information about the children and identified social workers working on the case, accusing them of kidnapping and human trafficking. As of March 29, Mother had not complied with the court's order to remove the GoFundMe page. The court issued an order to show cause regarding contempt and set a hearing in late April to address the issue.

CFS filed an addendum report for the late April 2024 hearing. CFS reported that Mother had removed most of the social media posts, except for the GoFundMe page and a consent form that contained confidential information about Nav. In early April, social workers and a law enforcement officer went to the family's residence to serve the warrant to apprehend Nala. Nala was grocery shopping with Mother. On a telephone call, Mother disputed that CFS had a proper warrant and told the social worker to leave the property.

During a visit with the children in mid-April 2024, Nori and Nolan told Mother that the caregiver asked them to take the trash out. Mother interrupted and said, "'[S]he has you taking the trash out,'" after which both Nori and Nolan started crying. Mother called law enforcement and reported that the caregiver was hitting the children, making them go to bed early, and forcing them to take out the trash. As a result of Mother's concerns, Nav., Nia., and Nolan were not returned to the caregiver's home and were instead placed together in a respite home until placement could be found. At a hearing on the order to show cause, Mother's counsel claimed that Mother mistakenly believed that

15

she had removed the social media posts that contained identifying information about the children. Counsel represented that Mother would remove the children's photograph from the GoFundMe page that day, which the court indicated was all that Mother needed to do.

CFS filed an addendum report in late May 2024 and reported that CFS submitted a referral for services because the parents signed consent forms in late April. Less than two weeks later, Mother told a social worker that she did not understand why she had to attend individual therapy. The social worker started to explain why, but Mother ended the telephone conversation. The following day, Mother sent the social worker an email indicating that she was formally withdrawing her consent to attend therapy. Mother believed that it would be "unjust" for her to attend therapy on the false premise that Anthony lived in the home after the prior case.

During a visit with the children in mid-April 2024, a social worker noticed a pair of sunglasses with a blinking light on a table. The social worker informed the parents that they were not allowed to record visits, which the parents denied doing.

In late April 2024, Nav., Nolan, and Nori were placed together in a new foster home. One month later, the caregiver submitted a 14-day notice asking to have the children removed from her home because she felt as though "the 'parents have a different and new complaint/allegation each week.'"

Two days before a scheduled child and family team meeting in mid-April 2024, Mother informed CFS that she would not participate. The meeting was held the following month. The social workers explained to both parents that they were allowed to

16

participate in therapy with their preferred providers but that CFS would need to speak to their therapists to ensure that the therapy addressed CFS's concerns. Mother did not agree with CFS's concerns and denied that Anthony was in her home, but she agreed to participate in therapy through a county-contracted provider. In an addendum report filed the following month, CFS reported that both parents were participating in individual therapy.

Niy. contacted a social worker in June 2024 and asked for her siblings to be placed with her. Niy. was staying with a friend because her parents had kicked her out of the house. She was upset that "she lost 'all my rights to foster care because of them.'" Niy. disclosed that "her parents are unfit but was unwilling to provide detail or testify before the court." The social worker explained to Niy. that she could not be considered for placement because of her lack of housing and employment, among other reasons.

B.      *Contested jurisdiction hearing*

The court held a contested jurisdiction hearing over the course of two days in June 2024. Both parents and four social workers testified.

Father testified that Anthony was 20 years old and lived in a residence provided through Job Corps. Father denied that Anthony had lived with the family since March 2022 (when the referral in the prior case was made), visited in-person with his siblings, or attended any family holiday gatherings. Asked what initiated the previous dependency proceeding, Father responded, "We called for help. I was lied on." Father explained that the social workers had lied, and he said that no allegations were found true in the

17

previous case. CFS's counsel specifically asked Father if he was "aware that the Court previously found that Anthony Jr. sexually assaulted Nala," and Father answered, "The Court didn't find that because it wasn't true."

Father repeatedly stated that he did not know whether Anthony sexually abused any of his siblings. Father did not believe that Anthony would harm or sexually abuse any of his siblings. Father denied that anyone other than Nala had accused Anthony of sexually abusing them, but he then admitted that Niy. too had accused him. Father did not believe that his daughters were given an opportunity "to speak the truth" during the previous proceeding, so "the whole truth about this story" remained unknown.

After the first dependency case, the family implemented several safety precautions, namely, door chimes, a lock "on the girls' door," and a security camera. Niy. and Nala had not indicated that they were harmed in between the two dependency cases. Father said that he "would report it" if any of his children were physically or sexually abused.

Mother corroborated Father's testimony that Anthony had not lived in the home since March 2022, in compliance with the court's orders in the previous dependency case. Mother was not sure whether Anthony had any contact with Niy. and Nala since March 2022, but Mother said that he had not had any contact with his four youngest siblings.

Mother explained that the prior dependency case was initiated when Nala told her that she had orally copulated Anthony, and Mother called wraparound services for assistance. Mother understood that Niy. also disclosed to a wraparound service provider that she had sexual contact with Anthony. Asked whether Mother believed that Anthony had sexual contact with his sisters, Mother answered, "[Y]eah" and "I don't know." Mother explained that she had "the full story of what happened between my kids," claiming that Niy. initiated oral sex with Anthony after a girl at a park showed Niy. pornography depicting oral sex. With respect to Nala, Mother explained, "And then I guess it got to Nala. Nala got involved with [Niy.], and then, I guess, some type of way—they were all involved in it." Mother clarified, "From [what] the girls have told me, [Niy.] started the whole thing. She involved Nala. They were doing things together, and the brother was involved, too, as well." Mother believed that Niy. and Nala engaged in sexual activity with each other. Asked whether she disclosed that to CFS, Mother responded, "They never really tried to get the full story from us."

Mother did not know who bore responsibility for the incident between Niy. and Anthony, and she believed that "all three of them were victims." Asked specifically about whether Anthony bore any responsibility, Mother answered, "If they're all kids, why would he bear responsibility just by his self?" Asked whether Anthony posed a risk to any of his siblings, Mother responded, "I don't believe so. The girls—they still want contact with their brother." Mother denied the allegation that she had failed to protect her children.

The social worker responsible for managing the current case testified that once she had passed by a Del Taco while transporting Nori to a visit, and Nori commented "that her brother used to work there, and he would bring her milk shakes." The social worker supervised more than five visits, during which Nolan once asked, "'Did Anthony leave,'" and "Nori asked if she can have his Play Station." A social worker who worked on the prior dependency case through dismissal testified that the parents were advised that Anthony was not allowed to visit any of the other children or to be at the house when they were there.

With respect to the four youngest children—Nav., Nia., Nolan, and Nori, the court found true allegations against both parents under subdivisions (b)(1) and (j) of section 300. The court found under section 300, subdivision (b)(1), that Mother and Father "allowed adult sibling [Anthony] to reside in the home despite being aware that he sexually abused siblings [Nala and Niy.], thus placing [their] child[ren] [Nav., Nia., Nolan, and Nori] at risk of abuse." With respect to Nia., Nolan, and Nori, the court additionally found true an allegation under subdivisions (b)(1) and (j) of section 300 that they were prior dependents of the court on the basis of the parents' "negligent failure to protect the children from sexual abuse." As to Nav., the court found under subdivision (j) of section 300 that all of her siblings except Anthony had previously been adjudged dependents because of the parents' failure to protect them from sexual abuse.

20

With respect to Nala, the court noted that there was a warrant to apprehend her, so the court could not take jurisdiction over her. The court set a further in-progress jurisdiction and disposition hearing.

C.    *Contested disposition hearing*

The contested disposition hearing was held in late July 2024. The court received into evidence an addendum report from CFS that was filed on the day of the hearing.

The court summarized evidence that it found relevant from the jurisdiction hearing. The court found it "greatly disturb[ing]" that Father still denied the allegations found true in the prior case and thus denied that Anthony sexually abused Niy. and Nala. The court also described how Mother testified that she was unsure about whether the sexual abuse occurred and believed that if it did happen then all three children—Niy., Nala, and Anthony—were victims and that all three children bore responsibility for any sexual contact.

The court summarized the evidence that Anthony lived with the family after the prior case was closed, and the court noted that with respect to the removal determination it was "faced with allegations that were found true in which the [Mother and Father] allowed Anthony to have contact with the children in this case, including the two girls who said they were sexually assaulted, which put the children at risk." The court acknowledged that the standard of proof at the jurisdictional phase is preponderance of the evidence, but the standard for removal is clear and convincing evidence. The court then quoted the following passage from *In re A.F.* (2016) 3 Cal.App.5th 283 (*A.F.*):

21

"'Jurisdictional findings in a dependency case are prima facie evidence that the children cannot safely remain in the home.'" Relying again on *A.F.*, the court reiterated that it had to find by clear and convincing evidence that there was a substantial danger to the physical health, safety, protection, or physical or emotional well-being of Nav., Nia., Nolan, and Nori if they were returned to their parents' custody.

The court then discussed the evidence contained in the addendum report filed by CFS that day. CFS recommended removal of the four youngest children and reunification services for the parents. CFS expressed concern about whether the parents were benefitting from services, the parents' unwillingness to admit that Anthony was in the home or around the children, and their continued denial of the sexual abuse.

CFS reported that Nala still lived with the parents and refused to be taken into custody. The social worker spoke with both parents' therapists. Mother's therapist believed that although Mother was "somewhat difficult" in the beginning, she appeared to have progressed to the point of being willing to comply with CFS's requests. But the therapist reported that Mother did not admit that any sexual abuse occurred. The therapist believed that Mother had a personality disorder and was strong-willed but not a liar. The therapist planned to request additional services so that she could continue working with Mother. Father had one session of therapy remaining, and his therapist did not recommend additional sessions because he did not believe that Father would "'budge' regarding his stance on the Department's involvement." Father refused to acknowledge

CFS's involvement and insisted that Anthony was never in the home. Father also told the therapist that Anthony was never arrested or referred to services.

Social workers also met with both parents in late June 2024. They asked Mother what she had learned from therapy, and she responded, "'The counselor said he was confused.'" Father interrupted the conversation and took Mother into another room to talk; after the parents returned, no additional questions about therapy were asked.

After discussing the newly admitted evidence on the record, the court said: "[W]hen reviewing some of the testimony, it does concern the Court that this is a second case presently before the Court dealing with allegations of sexual abuse that the Court previously found true in the first case, and yet [Father] still does not believe that any such abuse occurred in the home. Mother and Father have testified they are going to cooperate; however, their actions speak differently, based on the history of the first removal, and the history of this case as well, based on the testimony that was presented, and the reports that were received into evidence."

The court found that there was clear and convincing evidence that "there is a substantial danger to the physical health, safety, protection, physical or emotional well-being of [Nav., Nia., Nolan, and Nori] or would be if the children were returned home." The court removed all four children from both parents and ordered reunification services for both parents.

DISCUSSION

Both parents argue that the juvenile court applied an erroneous legal standard when it stated that the jurisdictional findings are prima facie evidence to support removal of the children from parental custody. Both parents also challenge the sufficiency of the evidence supporting removal of Nolan and Nav. We find no prejudicial error.[2]

Section 361(c)(1) provides that in order to remove a child from their parents' physical custody "the juvenile court must find by clear and convincing evidence that (1) there 'would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being' of the child in the parents' home, and (2) 'there are no reasonable means by which the [child's] physical health can be protected without' removal." (*In re Zoe H.* (2024) 104 Cal.App.5th 58, 71 (*Zoe H.*), quoting § 361(c).)

We review the removal findings for substantial evidence, "taking into account the level of confidence that the 'clear and convincing evidence' standard demands." (*Zoe H.*, *supra*, 104 Cal.App.5th at p. 71; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.) In analyzing the sufficiency of the evidence, we "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, at pp. 1011-1012.)

---

**2** Mother also has filed a petition for writ of habeas corpus, *In re L.B.* (Mar. 25, 2025, E085771). We summarily deny the petition by separate order.

24

Ten days after the disposition hearing in the present case, we published *Zoe H.* (*Zoe H.*, *supra*, 104 Cal.App.5th at p. 58.) In that opinion, we explained that section 361(c)(1) provides that jurisdictional findings constitute prima facie evidence for removal only "if jurisdiction was based on severe physical abuse of a child under age five" under section 300(e). (*Zoe H.*, at p. 72; § 361(c)(1) ["[t]he fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left [in the home]"].) If jurisdiction is "taken under other subdivisions of section 300 but not under section 300(e), the jurisdictional findings do not constitute prima facie evidence that the children cannot safely remain in the home." (*Zoe H.*, at p. 72.) Contrary statements in *A.F.* and similar cases are not supported by the statutory language. (*Zoe H.*, at pp. 61-62, 72-73; *In re E.E.* (2020) 49 Cal.App.5th 195, 218-219; *In re M.V.* (2022) 78 Cal.App.5th 944, 958.)

The juvenile court repeated *A.F.*'s misstatement of the law when it said that "'[j]urisdictional findings in a dependency case are prima facie evidence that the children cannot safely remain in the home.'" But the court did not rely on the sustained jurisdictional allegations as the sole basis for removing the children. Rather, the court also found that removal was supported by clear and convincing evidence. Thus, although the court mentioned the *A.F.* standard for removal, which is not supported by section 361(c)(1), the court also applied the correct standard. Assuming for the sake of argument that the court's reference to the *A.F.* standard constituted error, the error was harmless

25

unless it is reasonably probable that the parents would have achieved a more favorable result absent the error. (*In re Celine R.* (2003) 31 Cal.4th 45, 60.)

Again, the record shows that the court independently found that removal was supported by evidence other than the sustained jurisdictional allegations. At the disposition hearing, the court did not merely rely on the existence of the jurisdictional findings—that is, that the youngest four children were at risk of abuse because Anthony lived in the home after the prior dependency case and that he had previously been found to have sexually abused Nala and Niy. Instead, the court expressly based its findings on the ample evidence that even now the parents do not believe that Anthony sexually abused Niy. or Nala, or are equivocal about it, or believe that all of the children, including Anthony, were victims. The court also considered newly admitted evidence chronicling the parents' behavior in the month following the jurisdiction hearing, including reports from both parents' therapists that they continued to deny that Anthony sexually abused Niy. or Nala and that Father's therapist did not believe there was any value in continued therapy with Father, given Father's stubbornness and denial of the basis for CFS's involvement (despite the sustained allegations).

Because the record shows that the court independently found removal supported by clear and convincing evidence other than the sustained jurisdictional allegations, any error in referring to the *A.F.* standard is harmless unless the removal findings were not supported by substantial evidence. But the parents do not argue that removal findings as to Nori and Nia. were not supported by substantial evidence. Because the parents have

26

not carried their burden of showing that the court's legal error was prejudicial as to Nori and Nia., we must affirm the disposition as to both of those children. (*Conservatorship of Farrant* (2021) 67 Cal.App.5th 370, 378.)

Both parents do argue, however, that there is insufficient evidence to support the removal findings as to Nav. and Nolan. (§ 361(c)(1).) Relying on *In re I.J.* (2013) 56 Cal.4th 766 (*I.J.*), the parents contend that Nav. and Nolan were differently situated from Nori and Nia. because of Nav.'s age and Nolan's gender. In particular, the parents argue that there was no evidence that Nav. or Nolan was at any risk of sexual abuse by Anthony because Nav. was so young that she would be under constant supervision and there was no evidence that Anthony would target a male child. We are not persuaded.

With respect to both Nav. and Nolan, the court sustained allegations under subdivision (b)(1) of section 300 that the parents placed Nav. and Nolan at risk of abuse by allowing Anthony to reside in the home even though they knew that he sexually abused Niy. and Nala. The court also found true that Nav. and Nolan were at risk of abuse under subdivision (j) of section 300 because all of the children other than Nav. had been adjudged dependents in the prior proceeding on account of the parents' failure to protect the children from sexual abuse. The parents do not challenge those sustained allegations, so it is uncontested that Nav. and Nolan were at risk of abuse on those grounds. Given the sustained allegations concerning the risk of abuse, we must reject the parents' argument that for purposes of removal Nav. and Nolan were not at risk of sexual abuse by Anthony. Although the sustained allegations do not by themselves constitute

prima facie evidence to support removal (*Zoe H.*, *supra*, 104 Cal.App.5th at p. 72), the parents cannot challenge the removal findings by presupposing that the jurisdictional allegations are false.

Moreover, Nav.'s age and Nolan's gender notwithstanding, the magnitude of the risk of sexual abuse to Nav. and Nolan is greater given the egregiousness of the known abuse. (*I.J.*, *supra*, 56 Cal.4th at p. 778 ["'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great'"]; *In re S.R.* (2024) 104 Cal.App.5th 44, 53 ["In general, the more egregious the abuse experienced by the sibling, 'the more appropriate for the juvenile court to assume jurisdiction over the siblings' under section 300(j)"].) Niy.'s disclosures reveal that the abuse may have started when she was as young as four years old and occurred over the course of years. Nala's disclosures reveal that the sexual abuse occurred more than once, started when she was seven or eight years old, and involved the use of force. In addition, much remains unknown about the abuse because the parents did not allow CFS to conduct forensic interviews of either Niy. or Nala in the prior dependency case. (Cf. *S.R.*, at p. 50 [law enforcement conducted a forensic interview of the daughter concerning the sexual abuse].) All of that evidence supports removal of both Nav. and Nolan from the parents.

The juvenile court also could reasonably infer that Nav. was at greater risk because she was only one year and four months old. Nav. would be unable to protect herself from any abuse and unable to report any abuse.

28

The risk to either Nav. or Nolan is further exacerbated by the parents' continued denial and minimization of the sexual abuse and denial that Anthony even lived at the home. The court could reasonably infer that the parents did not believe that Anthony posed a risk to any of the children, and the court could likewise infer that the parents consequently would not adequately protect Nav. and Nolan from any such risk. Moreover, because Nala remained at home at the time of disposition, there existed a risk that Nav. or Nolan might witness Anthony sexually abusing Nala. (See *I.J.*, *supra*, 56 Cal.4th at p. 778 [the possibility that the child could have witnessed the sexual abuse of the sibling is "relevant to the totality of the circumstances surrounding the sibling abuse," which the court should consider in determining whether the child is at risk].)

For all of these reasons, substantial evidence supported the juvenile court's removal findings as to Nav. and Nolan. Any error in citing an alternative standard for removal therefore was harmless as to Nav. and Nolan, so the disposition as to both of those children must be affirmed.

DISPOSITION

The dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

FIELDS
Acting P. J.

RAPHAEL
J.

29